## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### Indianapolis Division

| | |
|---|---|
| MATTHEW O'RILEY, | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) **Case No.**    1:19-cv-4 |
| | ) |
| EQUIFAX INFORMATION SERVICES, LLC, | ) |
| ONE MAIN FINANCIAL GROUP, LLC, and | ) |
| PNC MORTGAGE, NA, | ) |
| *Defendants*. | ) |

### COMPLAINT AND JURY TRIAL DEMAND

Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, et seq., consumer reporting agencies are charged with three primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports;  the duty to reasonably reinvestigate consumers' disputes of inaccurate information; and, the duty to then appropriately correct or modify the disputed information.  A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information.  This is because the furnisher of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

### Jurisdiction and Venue

1.      Because this case arises under the Fair Credit Reporting Act, 15 U.S.C.A. § 1681 *et seq.*, jurisdiction of this Court arises under 28 U.S.C.A. § 1331 (West).

2.      Venue is proper in this Court because a substantial part of the claim arose in Indiana, O'Riley resides in Indiana, and all Defendants "reside" in Indiana, as that term is used in 28 U.S.C.A. § 1391 (West).

## Parties

3.       Plaintiff, Ron O'Riley (hereinafter "O'Riley"), is a natural person who resides in Indianapolis, Indiana.

4.       O'Riley is an individual and is therefore a "consumer" as that term is defined by 15 U.S.C.A. § 1681a(c) (West).

5.       Defendant Equifax Information Services, LLC. (hereinafter "Equifax") is a credit bureau that conducts business in Indiana.

6.       Equifax regularly assemble and/or evaluate consumer credit information for the purpose of furnishing consumer reports to third parties, and use interstate commerce to prepare and/or furnish the reports, and accordingly, are each considered a "consumer reporting agency" as that term is defined by 15 U.S.C.A. § 1681a(f).

7.       Defendant PNC (hereafter "PNC") regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about O'Riley's transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2 (West).

8.       Defendant OneMain Financial Group, LLC (hereafter "OneMain") regularly and in the ordinary course of business furnished information to one or more consumer

reporting agencies about O'Riley's transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2 (West).

### Factual Allegations Regarding the Consumer Credit Reporting Industry, Reporting Standards, Disputed Information, and Credit Scoring

9.       The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even

employment. Between two and three million consumer reports are issued by credit bureaus each day. See, *http://www.cdiaonline.org/about.cfm*.

10.     In 2012, Federal Trade Commission conducted a study regarding consumer credit reporting errors, and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), Executive Summary, available at *https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade- commission/130211factareport.pdf*

11.     Consumers can help raise their credit score by having errors on their credit reports corrected[1], and consumers seeking to rebuild their credit would be well-advised to obtain their credit reports and review them for accuracy, since both creditors and credit bureaus make errors[2].

12.     The Consumer Data Industry Association ("CDIA") is an international   trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

13.      Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

14.     In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian

---

[1]  John Ulzheimer, Fastest Ways to Raise Your Credit Score 100 Points, available at
https://www.thecreditsolutionprogram.com/fastest-ways-to-raise-your-credit-score-100-points?all=1 (accessed November 16,2017)
[2] John Ulzheimer, How Do I Rebuild Credit After A Bankruptcy? (March 4, 2011), available at
https://blog.smartcredit.com/2011/03/04/how-do-i-rebuild-credit-after-a-bankruptcy/ (accessed November 16,2017)

Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year. See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515*

15.     The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

16.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

17.     Equifax has actual knowledge that entities reviewing consumer reports prepared by them reasonably presume they have complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data in those consumer reports.

18.     § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

19.     To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc.) along with Innovis Data Solutions, Inc. developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. See, *http://www.e-oscar.org/*.

20.     The e-OSCAR system primarily supports Automated Credit Dispute Verification

("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

21.     ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

22.     The CRAs named herein have actual knowledge that entities reviewing consumer reports prepared by Trans Union reasonably presume that Trans Union has complied with its duties under § 1681i in correcting disputed information and thus maintaining the maximum possible accuracy of data reported in consumer reports.

23.     One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation.

24.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores).

25.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default.  Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p 53, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf*, (accessed November 16, 2017).

26.     The Fair Isaac Corporation credit scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 standards.

27.     FICO scores are calculated from five main categories of credit data in a consumer's

credit report.  Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, *www.myfico.com/credit-education/whats-in-your-credit-score/*

28.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

29.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

30.    The improper suppression or modification of a mortgage tradeline adversely affects a consumer's FICO score, as the suppression removes any positive payment history associated with that mortgage (35% of a consumer's FICO score), it alters the age/length of credit history (15% of a consumer's FICO score), and it alters the mix of accounts/types (10% of a consumer's FICO score).

31.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

32.    Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

33.    Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including but not limited to the length and age of credit history,

and the use of certain types of credit.  Federal Trade Commission, *Credit-Based Insurance Scores:*

*Impacts on Consumers of Automobile Insurance* (July 2007), p 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-*

*consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-*

*based_insurance_scores.pdf* (accessed November 16, 2017).  As cited in *Ins. Inst. V. Commissioner*,

486 Mich. 370, 785 N.W.2d 67 (2010)

34.     Credit-based insurance scores evolved from traditional credit scores, and all major

automobile insurance companies use credit-based insurance scores in some capacity; insurers use

these scores to assign consumers to risk pools and to determine the premiums that they pay.  *Id*., at

22.

35.     Homeowner's insurance companies also use credit scores to decide whether to issue

policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk,

which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores.*

### Factual Allegations Giving Rise To This Action

36.      On or about December 5, 2011, O'Riley filed a Chapter 13 bankruptcy proceeding

in the Southern District of Indiana, under Cause No. 11-14876-RLM-13.

37.      One Main was listed on his Schedule D, showing a claim in the amount of

$8,254.00.

38.      PNC was listed on his Schedule D, showing a claim in the amount of $111,000. A

copy of Schedule D is attached as "Exhibit A."

39.      On February 22, 2012, PNC filed a Proof of Claim in the amount of

$114,041.82.

40.     On March 6, 2012, O'Riley filed his Chapter 13 Plan in accordance with 11 U.S.C. §1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future mortgage payments directly to PNC.

41.     O'Riley met all requirements of his Chapter 13 bankruptcy and as a result, he received a discharge by Order dated January 12, 2017.

42.     O'Riley's obligation to OneMain was discharged.

43.     O'Riley's mortgage obligation to PNC was not discharged.

44.     O'Riley's mortgage obligation to PNC is not subject to discharge under 11 U.S.C. § 1328(a)(1). *See*, In re Duke, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

45.     Accordingly, O'Riley has continued to make, and PNC has continued to service and accept, monthly mortgage payments on the aforementioned obligations.

**Inaccurate, Incomplete, and Materially Misleading Information Reported by Equifax.**

46.     Sometime in February of 2018, O'Riley obtained a copy of his consumer credit report as published by Equifax.

47.     The report contained erroneous information as provided by OneMain relative to the obligations described above, published and reported by Equifax.

48.     Specifically, the Equifax credit report reflected that the accounts representative of O'Riley's

49.     The report also contained erroneous information as provided by PNC, now published and reported by Equifax.

50.     Specifically, the Equifax credit report reflect that the account representative of

O'Riley's ongoing obligation to PNC, was closed and that the date of O'Riley's last payment towards the account was in August of 2012, yet failed to include any indication whatsoever of the timely and adequate payments he has made and continues to make on each account.

51.     Because O'Riley continues to make timely and adequate payments towards them, the information described above was inaccurate, incomplete, and misleading.

52.     Equifax's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, as discussed above.

53.     While not dispositive, Courts rely on such guidance to determine furnisher liability. *See e.g*. Nissou-Rabban v. Capital One Bank (USA), N.A., 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018)

54.     Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n(a). *See* Gillespie v. Equifax Info. Servs., LLC., No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

55.     In a letter dated July 24, 2017, O'Riley disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.  A copy of the dispute letter is attached hereto as "Exhibit B."

56.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify OneMain and PNC of Plaintiff's dispute within five business days of receiving Plaintiff's dispute, to forward all relevant information and any documents included with Plaintiff's dispute for OneMain and PNC to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Plaintiff's consumer file.

57.     In response, within a document dated May 8, 2018, Equifax advised O'Riley that it

had researched his dispute and the current status was being reported correctly. However, Equifax

provided a copy of the tradeline as reported that reproduced the errors identified by O'Riley in his

original dispute letter. A copy of the Equifax reinvestigation report is attached as "Exhibit C."

58.     Equifax failed to address or include anything relative to O'Riley's First Mortgage

on the Ehler Drive property within its reinvestigation report.

59.     O'Riley provided all necessary information with his dispute letter to Equifax, does

have a current Equifax file, and has actively used credit in the past ten years.

60.     Equifax was required to communicate the specifics of O'Riley's dispute to

OneMain and PNC.   Likewise, OneMain and PNC had a duty to investigate the dispute and

accurately report their findings to Equifax.

61.     Equifax had an affirmative duty to reasonably reinvestigate the dispute submitted by

O'Riley and to accurately report the tradeline information notwithstanding the information it

received from OneMain or PNC.

**Equifax's Willful Conduct in Detail.**

62.     Under § 1681i, which mandates the procedures a CRA must follow in cases of

disputed accuracy, there are (only) two scenarios under which a CRA *may* legally be allowed to

refrain from notifying the furnisher of disputed information of a consumer's dispute: 1.) if a CRA

determines that a consumer's dispute is frivolous or irrelevant; and/or, 2.) if the CRA resolves

the dispute under an expedited dispute resolution process.

63.     Neither scenario applies to Equifax's conduct as complained of herein.

64.     Under § 1681i(a)(3), a CRA *may* be relieved of its duty to notify the furnisher

of the disputed information of the consumer's dispute if the CRA determines that a consumer's

dispute is frivolous or irrelevant.

65.     However, because § 1681i(a)(2) requires that a CRA notify a furnisher of disputed information within five days of receiving a consumer's dispute, the CRA must make the determination that the dispute is frivolous or irrelevant before the five (5) days is up.

66.     In the event, a CRA determines that a consumer's dispute is frivolous or irrelevant, § 1681i(a)(3) requires the CRA to notify the consumer notice of the CRA's determination. That notice must: be given within five days of the CRA's determination; be in writing, or by other means authorized by consumer; state the reason(s) the CRA determined the dispute was frivolous or irrelevant; and, identify any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

67.     Equifax did not inform O'Riley that it had determined his dispute was frivolous or irrelevant, as required by § 1681i(a)(3)(B) if a dispute is determined to be frivolous or irrelevant.

68.     Equifax' did not identify any information required to investigate O'Riley's dispute, as required by § 1681i(a)(3)(C) if a dispute is determined to be frivolous or irrelevant.

69.     Rather, in its reinvestigation report Equifax asserted their investigation was complete.

70.     The assertion that their investigation was complete is is patently false – none of the CRA's named herein performed an investigation/reinvestigation.

71.     However, the assertion does make it clear they did not determine O'Riley's dispute to be frivolous or irrelevant.

72.     Because the CRA's named herein did not determine O'Riley's dispute to be frivolous or irrelevant under § 1681i(a)(3), and did not comply with the Expedited Dispute

Resolution requirements of § 1681i(a)(8), then pursuant to § 1681i(a)(2) t h e y w e r e required to notify OneMain and PNC of Plaintiff's dispute.

73.     Plaintiff's dispute was clear and unambiguous as to the inaccurate information that Equifax was reporting.

74.     Equifax's had clear notice that the information it was reporting was false and misleading.

75.     Plaintiff provided Equifax with all of the necessary information for them, OneMain, and PNC to investigate O'Riley's dispute, and to correct the false and misleading information.

76.     If Equifax had conducted a reasonable reinvestigation and notified PNC of Plaintiff's dispute, the mortage information at issue would be reported accurately.

77.     Despite the foregoing, Equifax made the intentional choice to not conduct a reasonable reinvestigation of Plaintiff's dispute, in reckless disregard of its duties under the FCRA.

78.     Accordingly, their conduct was willful.

### Equifax's Conduct Has Injured O'Riley By Diminishing O'Riley's Credit Score

79.     Equifax has injured O'Riley by diminishing his FICO and other credit scoring model scores.

80.     Equifax impermissibly suppressed significant portions of, and modified other portions of, O'Riley's PNC tradeline without cause and without conducting a conducting a reasonable reinvestigation of the disputed information, and without notifying PNC of O'Riley's dispute.

81.     The suppression of mateial elements of the PNC tradeline from O'Riley's

consumer reports negatively affects and diminished his FICO and other credit scoring model scores, by excluding otherwise positive payment history, length of credit history, and credit mix information that would, but for the suppression or modification, be used to calculate O'Riley's credit scores.

82.     The Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III.  *Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that he suffered an injury in fact, he has standing to pursue his complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS

69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through his claim that his credit score suffered as a result of the credit report he disputes").

83.     Plaintiff is desirous of improving his FICO and other credit risk modeling scores.

84.     As such, Plaintiff took specific actions to address inaccuracies in his credit reports.

85.     If Equifax had conducted a reasonable reinvestigation and had notified PNC of O'Riley's dispute, the tradeline at issue would be reporting as a current, positive account.

86.     If the PNC tradeline were reporting as a current, positive account, O'Riley's FICO and other credit scoring model scores would be improved.

87.     The CRA's decision to materially suppress or alter, in whole or in part, the PNC tradeline from O'Riley's consumer reports without conducting a reasonable reinvestigation of the disputed information, and without notifying PNC of O'Riley's disputes, is a direct and proximate cause of the decrease to O'Riley's FICO and other credit scoring model scores.

**TRIAL BY JURY**

88.     O'Riley is entitled to and hereby requests a trial by jury.

**CAUSES OF ACTION**

**COUNTS I & II: VIOLATION OF THE FCRA (EQUIFAX)**
[15 U.S.C.A. § 1681e(b) and 1681i (West)]

89.     O'Riley incorporates by reference all preceding paragraphs as though fully stated herein.

90.     Equifax  negligently, or in the alternative willfully, violated 15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of O'Riley's consumer reports.

91.     Equifax also negligently, or in the alternative willfully, violated 15 U.S.C.A. § 1681i

in multiple ways including without limitation by failing to conduct a reasonable reinvestigation of O'Riley's dispute and by failing to appropriately delete or modify inaccurate information in O'Riley's file. *See* Zahran v. Bank of Am., 2015 WL 4397779 (N.D. Ill. July 17, 2015)

92.    As a result of Equifax's violation of 15 U.S.C.A. § 1681e(b) and 15 U.S.C.A. §1681i O'Riley has suffered actual damage including but not limited to emotional distress, the unjust suppression of his FICO credit score, the resulting payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, O'Riley is entitled to recover actual and statutory damages pursuant to 15 U.S.C.A. § 1681n and 1681o (West).

93.    O'Riley is entitled to recover costs and attorney's fees from Equifax pursuant to 15 U.S.C.A. § 1681n and 1681o.

## COUNT III  VIOLATIONS OF THE FCRA (PNC)
### [15 U.S.C.A. § 1681s-2(b)]

94.    O'Riley incorporates by reference all preceding paragraphs as though fully stated herein.

95.    PNC willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of O'Riley's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, delete, and/or block the inaccurate information.

96.    As a result of PNC's violations of 15 U.S.C.A. § 1681s-2(b), O'Riley has suffered actual damages including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of his FICO credit score, the payment of increased

costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, O'Riley is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

97.     PNC'S actions and omissions were willful, caused O'Riley concrete injury as set for above, rendering it liable for punitive damages and/or statutory damages pursuant to 15 U.S.C.A. § 1681n.

98.     O'Riley is entitled to recover costs and attorney's fees from PNC pursuant to 15 U.S.C.A. § 1681n and 1681o.

### COUNT IV:  VIOLATIONS OF THE FCRA (OneMain)
[15 U.S.C.A. § 1681s-2(b)]

99.     O'Riley incorporates by reference all preceding paragraphs as though fully stated herein.

100.     OneMain willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of O'Riley's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, delete, and/or block the inaccurate information.

101.     As a result of OneMain's violations of 15 U.S.C.A. § 1681s-2(b), O'Riley has suffered actual damages including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of his FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm. Therefore, O'Riley is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

102.    OneMain's actions and omissions were willful, caused O'Riley concrete injury

as set for above, rendering it liable for punitive damages and/or statutory damages pursuant to 15

U.S.C.A. § 1681n.

103.    O'Riley is entitled to recover costs and attorney's fees from OneMain pursuant

to 15 U.S.C.A. § 1681n and 1681o.

**WHEREFORE**, O'Riley respectfully requests the following relief:

a.  Actual damages;

b.  Statutory damages pursuant to 12 U.S.C. § 2605(f)(2) for each and every violation

    discussed above;

c.  Reasonable attorney's fees and costs pursuant to 15 U.S.C.A. § 1681n and/or 1681o;

d.  That an Order be issued for the Defendants to modify the inaccurate information being

    reported; and

e.  Such other and further relief as may be just and proper.

Respectfully submitted,

*/s/ Travis W. Cohron*

Travis W. Cohron, No. 29562-30

**CLARK, QUINN, MOSES, SCOTT & GRAHN, LLP**

320 N. Meridian Street, Suite 1100

Indianapolis, IN 46204

Telephone: (317) 637-1321

Fax: (317) 687-2344

tcohron@clarkquinnlaw.com